**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| MJG Enterprises, Inc., | ) | No.  CV-10-0086-PHX-MHM |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| GLEN CLOYD, an individual; NATE | ) | |
| M. DEN BLEYKER, an individual; | ) | |
| GIBRALTAR FINANCIAL GROUP, | ) | |
| INC., a Colorado corporation; JOHN P. | ) | |
| JOHNSON, an individual; J. JOHNSON | ) | |
| CONSULTING, LLC, a Colorado | ) | |
| limited liability company; KIM ELAINE | ) | |
| McCREIGHT and JOHN DOE | ) | |
| McCREIGHT, wife and husband; | ) | |
| CALCOUNTIES TITLE NATION | ) | |
| COMPANY, a California corporation | ) | |
| f/d/b/a CALIFORNIA COUNTIES | ) | |
| TITLE COMPANY; THOMAS | ) | |
| MATTHEW NANTAIS and JANE DOE | ) | |
| NANTAIS, husband and wife; | ) | |
| GAYLORD & NANTAIS, a California | | |
| entity; PETER JACK RIMEL and JANE | | |
| DOE RIMEL, husband and wife; RIMEL | | |
| & NICHOLS, LLP, a California limited | | |
| liability partnership; ANTHONY TODD | | |
| WHITEHEAD, an individual; DOES 1- | | |
| 10; ABC BUSINESS ENTITIES 1-10, | | |
| | | |
| Defendants. | | |

Currently before the Court are three Motions to Dismiss MJG Enterprises, Inc.'s

Amended Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal

Rules of Civil Procedure filed on behalf of (1) Peter J. Rimel, Kimberly A. Rimel, and Rimel

1   & Nichols, LLP (Doc. 20); (2) Nate M. Den Bleyker, Gibraltar Financial Group, Inc., John

2   P. Johnson, and J. Johnson Consulting, LLC (Doc. 22); and (3) Glen Cloyd (Doc. 27).  Also

3   before the Court is Plaintiff's Motion to Strike Parts of Defendants Nate M. Den Bleyker,

4   Gibraltar Financial Group, Inc., John P. Johnson, and J. Johnson Consulting, LLC's Reply

5   in Support of Motion to Dismiss.  (Doc. 38).   Having determined that oral argument is

6   unnecessary, the Court issues the following order.

7   **I.     BACKGROUND**

8       **A.     Procedural History**

9       In December 2009, Plaintiff filed its First Amended Complaint ("FAC") against

10  Defendants Glen Cloyd, Nate M. Den Bleyker, Gibraltar Financial Group, Inc., John P.

11  Johnson, J. Johnson Consulting, LLC, Kim Elaine McCreight and Joe Doe McCreight,

12  CalCounties Title Nation Company, Thomas Matthew Nantais and Jane Doe Nantais,

13  Gaylord & Nantais, Peter Jack Rimel and Jane Doe Rimel, Rimel & Nichols, LLP, Anthony

14  Todd Whitehead, Does 1-10, and ABC Business Entities 1-10 in the Maricopa County

15  Superior Court in the State of Arizona.  (Doc. 5).  In the FAC, Plaintiffs bring twenty-four

16  counts against Defendants, either individually or collectively, including: Sale of Unregistered

17  Securities; Transactions by Unregistered Dealers or Salesmen; Securities Fraud; Investment

18  Advisory Services Fraud; Common Law Fraud/Constructive Fraud; Fraud in the Inducement;

19  Fraudulent Concealment; Consumer Fraud; Civil Conspiracy; Fraudulent Transfer and

20  Conveyance; Conversion; Negligent Misrepresentation; Negligence; Pattern of Unlawful

21  Activity; Breach of Contract; Breach of Implied Covenant of Good Faith and Fair Dealing;

22  Breach of Fiduciary Duty; and Aiding and Abetting Breach of Fiduciary Duty;  among

23  others.  (Doc. 5).  In January 2010, Defendants removed this case from Maricopa County

24  Superior Court.  (Doc. 1).

25      On January 26, 2010, Defendants Peter Rimel, Kimberly Rimel and Rimel & Nichols,

26  LLP, filed the instant Motion to Dismiss Pursuant to Rule 12(b)(2).  (Doc.  20).  Plaintiff

27  responded on March 1, 2010, (Doc. 31), and this motion became fully briefed on March 10,

28  2010.  (Doc.  35).  On January 26, 2010, Defendants Nate  N.  Den Bleyker, Gibraltar

1   Financial Group, Inc., John P. Johnson, and J. Johnson Consulting LLC filed the instant

2   Motion to Dismiss Pursuant to Rule 12(b)(2). (Doc. 22). Plaintiff responded on March 1,

3   2010, (Doc. 32), and the motion became fully briefed on March 19, 2010. (Doc. 36).

4   Finally, on February 5, 2010, Defendant Glen Cloyd, appearing pro se, filed the instant

5   Motion to Dismiss Pursuant to Rule 12(b)(2). (Doc. 30). Plaintiff responded on March 8,

6   2010, (Doc. 34), and the motion became fully briefed on March 8, 2010. (Doc. 34).

7   **B.   Factual Background**

8   Plaintiffs' allegations of material fact are assumed to be true and are construed in the

9   light most favorable to them. See Cousins v. Lockyer, 568 F.3d 1063, 1067 (9th Cir. 2009).

10   MJG Enterprises, Inc. ("Plaintiff"/"MJG") is an Arizona corporation with its principal

11   place of business in Phoenix, Arizona. (Doc. 5). Marguerite Gerhart is President of MJG's

12   President, but her husband, Anthony Mark Boscarino, manages MJG's day-to-day activities.

13   (Id.). At all relevant times, Boscarino and Gerhart resided in, and managed MJG from,

14   Arizona. Generally speaking, Plaintiff alleges that the Defendants participated in a scheme

15   meant to elicit Plaintiff's participation in a collateralized mortgage obligation ("CMO")

16   investment. (Doc. 5). CMOs are a type of mortgage-backed security, and are bonds that

17   represent claims to specific cash flows from large pools of home mortgages." U.S. Sec. &

18   Exch. Comm'n, Collateralized Mortgage Obligations, http://www.sec.gov/answers/tcmos.htm

19   (last updated June 25, 2007).

20   Specifically, Plaintiff alleges that in early November 2008, Boscarino was

21   approached about the possibility of investing in CMOs by Defendant Anthony Todd

22   Whitehead. Subsequently, Whitehead flew to Arizona and met with Boscarino to discuss the

23   CMO investment opportunity. (Id. at 6, ¶20). During these discussions, Whitehead

24   introduced Boscarino to Defendant Thomas Matthew Nantais, a California licensed attorney,

25   who assured Boscarino that CBOs were a worthwhile investment. (Id. ¶21). Some time

26   later, Nantais formed, or was supposed to form, ATM Enterprises, LLC ("ATM") to govern

27   compensation for the CMO investment between Whitehead, Nantais, and Boscarino. (Id.

28   ¶22). Nantais also acted as legal counsel for ATM. (Id. ¶23).

1    Defendant Den Bleyker, on behalf of himself and Defendant Gibraltar Financial

2  Group, Inc., and Defendant John P. Johnson, on behalf of himself and Defendant J. Johnson

3  Consulting, LLC, brokered the CMO investment deal under the Gibraltar Financial Group,

4  Inc. name.  As the brokers,  Den Bleyker and Johnson put together the buyers and sellers of

5  the CMO. (Id.  ¶24).  Defendant Peter  Rimel, on behalf of himself and Rimel & Nicholas,

6  LLP, was the trade desk associate or trader liaison for the CMO investment, and in this

7  capacity acted as an intermediary between Cloyd and Den Bleyker,  Nantais, Whitehead, and

8  Boscarino.   (Id. ¶25).  Rimel and Cloyd were introduced to  Boscarino as partners. (Id.

9  ¶26). Rimel and Cloyd selected Defendant CalCounties Title Nation Company to act as the

10  escrow company for the CMO investment, as they had allegedly used the company on a

11  regular basis in the past. (Id. ¶28). Defendant Kim Elaine McCreight was an escrow officer

12  at CalCounties Title Nation Company. (Id. ¶29).

13    At some point in time, Johnson drafted a Master Fee Agreement ("MFA") between

14  ATM and Gibraltar Financial group, Inc., and Michael Beans (a consultant).  The MFA set

15  forth the manner in which proceeds from the sale of the CMO would be divided amongst the

16  Parties, with "Gibraltar Financial Group,INC; Peter Rimel, Esquire; and Michael Beans agree

17  to a 60%;25%;10%;5% split on a first in first out basis, meaning ATM will receive the first

18  return of $1,000,000.00 USD (One Million United states Dollars) before any commission

19  split with all other Parties and/or assignees. After ATM receives the initial first One Million

20  United States Dollars, the Parties agree to split the remaining balance on a 60%; 25%; 10%;

21  5% basis into their separate accounts as described below." (Id. ¶34).  Plaintiff also alleges

22  that Johnson drafted the "Gibraltar-Escrow Depository" document, which set forth rules to

23  govern the escrow account. (Id. ¶35).

24    On February 17, 2009, Den Bleyker sent an email to McCreight advising her that

25  Boscarino, on behalf of Plaintiff, wished to open an escrow for one million dollars, and asked

26  McCreight to provide Boscarino and Nantais with instructions on how to wire the money to

27  the escrow account. (Id. ¶36).  Shortly thereafter, McCreight replied to Den Bleyker's email,

28  sending the requested wire instructions.  On February 18, Plaintiff wired one million dollars

from its Desert School Bank Account, in Arizona, to Bank of America in Costa Mesa. (Id. ¶38).  Soon thereafter, Boscarino became concerned about the CMO investment and retracted the wire transfer, causing one million dollars to be returned to MJG Enterprises.  According to Plaintiffs, however, Defendants talked Boscarino back into investing, advising him that that it was not possible for Plaintiff to lose its investment funds.  On February 23, 2009, Rimel sent Boscarino an email, copied to Nantais, Den Bleyker, Whitehead, and Cloyd, describing how the CMO investment works and stating that the CMO investment "should generate 2,000,000.00 to 2,500,000 a week profit for 40 weeks some weeks might be larger but they guarantee this amount."  (Id.  ¶41).  In two other emails sent that same day, Rimel made further guarantees about the profitability of the CMO investment, including that "nobody will take one dime of profit until you receive your initial $1,000,000," and "WE WILL NOT PURCHASE A BOND THAT WILL SUFFER A LOSS." (Id. ¶43–44).  Rimel went onto assure Boscarino that "your money is safe and secure with Cal Counties Escrow," and explained that the bonds Rimel wanted to purchase were "very secure."  (Id.  ¶45).

On February 24, 2009, Rimel advised Boscarino of a potential deal to purchase a bond for $1 million dollars, then sell it immediately for $1.8 million.  Rimel once again provided Boscarino with escrow instructions via an emails copied to  Nantais, Den Bleyker, Whitehead, and Cloyd.  In that email, Rimel asked Boscarino to wire $1.3 million to purchase a CMO bond, advising that "unlike the other escrow, this will go into a transactional escrow that we will pull the trigger on when we have an acceptable bond.  Then its game on!!!", and once again explaining how the CMO investment was likely to generate funds for the investors and was a low risk deal.    (Id.  ¶51–52). On March 11, 2009, in anticipation of the CMO investment, ATM and Gibraltar Financial Group entered into a Joint Venture Agreement, which set forth the various obligations of the parties with respect to the CMO purchase, including the distribution of the profits. (Id. ¶55–59).  Also on March 11, 2009, Rimel sent another email further explaining the CMO purchase and its likelihood of generating profits.    (Id. ¶60–64).

1        On March 11, Boscarino also received Holding Escrow Instructions, which provided

2   that: "California Counties title Company agrees to act as Escrow and Holding Agent for this

3   Transaction, where the responsibility of escrow shall be to hold funds for MJG Enterprises,

4   Inc., and Arizona Corporation ("Holding Party")."    (Id. ¶66).  That same day, MJG wired

5   $1.3 million dollars from its Desert Schools bank account to the Bank of America account

6   in Costa Mesa, California for Escrow KS -1l7. (Id. ¶67).  Once again, Boscarino became

7   concerned about the CMO investment and tried to retract the second wire, but was convinced

8   not do so by McCreight, who personally vouched for Cloyd's business acumen and ethics.

9   (Id. ¶68–69). This reassurance caused Boscarino to cancel his request for return of the wired

10  funds, which he did in conjunction with Gerhart, and on behalf of MJG.  (Id. ¶70).  This

11  decision was memorialized in "Amendment to Escrow Instructions," which contained a

12  section entitled "Authorization to Wire," and provided that the $1.3 million would be utilized

13  to purchase a CMO bond from JPMorgan Chase, but that the funds "would not be released

14  for the purchase of the CMO under any circumstances without holding party's explicit

15  written and executed instructions.    (Id.  ¶72-75).

16       Plaintiff, upon information and belief, alleges that someone executed another

17  Amendment to Escrow Instructions, which was dated March 13, 2009 and signed with Ms.

18  Marguerite Gerhart's forged signature, and caused the $1.3 million to be distributed to Fifth

19  Third Bank in the amount of $1,175,000, Noah Management Company in the amount of

20  $99,980, and Cadence Hill, Inc. in the amount of $25,000; not to JP Morgan Chase in the full

21  amount of $1,300,000 as provided in the March 11, 2009 Amendment to Escrow Instructions.

22  (Id. ¶76-77).   On March 19, 2009, Rimel sent Boscarino an email with an update on the

23  CMO investment, informing Boscarino that Cloyd "[was] negotiating the price of a top notch

24  commercial AAA bond with no back end default ratio" that pays out at a confirmed "2% of

25  face per week," and that four parties were interested  in purchasing the bond."    (Id. ¶82).

26  The next day, Cloyd sent Rimel a screen shot of a JP Morgan Chase Bond, which Rimel

27  forwarded to Boscarino, Nantais, Whitehead, and Den Bleyker.  (Id. ¶83). On March 23,

28  2009, Rimel informed Boscarino, along with Defendants Nantais, Whitehead, and Den

Bleyker, that they "were outbid on the bid I screened to you Friday," but advised the group not to worry because Cloyd "found a better one, a JP Morgan commercial AAA bond."  (Id. ¶84–85).

Eventually, on March 24, 2009, Rimel sent an email to Boscarino that a CMO had been purchased with a face value of approximately $1.1 million, and that a buyer may have been located who was willing to purchase the CMO for $2.75 million.  (Id. ¶90).  Over the course of the next week, Rimel sent emails to Boscarino, Whitehead, Nantais, Johnson, and Den Bleyker informing them about progress being made towards selling the CMO. (Id. ¶90-97).  On March 31, in an email to Boscarino, copied to Whitehead, Nantais, Johnson, and Den Bleyker, Rimel informed Boscarino that within a couple of days MJG would receive $2.3 million, less escrow fees, into its escrow account at CalCounties. (Id. ¶103).  The email attached a "trade ticket" for the purchased CMO bond, which appeared to show that the CMO was actually not purchased or held in Plaintiffs name, but was purchased by a  Thomas C. Cooper of San Diego, California and was being held in an Oppenheimer brokerage account for a trust known as the Norema CG Trust.  At this point, Whitehead expressed concern about who actually owned the bond, but was assured by Rimel that the investment group had control over the bond.  (Id. at ¶106).  On April 1, 2009, Rimel advised Boscarino, along with Whitehead, Nantais, Den Bleyker, Rimel, and Cloyd, that the $2.3 million expected to be in escrow that day had not been put in escrow "because the brokers on [the buyer's] side wanted a whole bunch of agreements prepared and signed. This had held the matter up all day, I am told. Certainly, neither Glen nor I are signing any agreements with these folks."  (Id.  ¶108). They are still in the hunt, but we are seeking other potential parties."  That same day, Rimel propositioned Boscarino concerning another CMO-bond investment opportunity.  (Id. ¶109).  On April 3, Rimel informed Boscarino via email that contracts with a buyer had been signed and money would soon be placed in an escrow account. (Id. at ¶113).  On April 8, 2009, MJG and Johnson Consulting, LLC entered into a Joint Venture Agreement, "for the purpose of establishing an Asset Management Agreement with a responsible and licensed Security Trader capable of evaluating and placing

1    value on the financial instruments presented to Trader as well as cash. In addition, the Parties

2    agree to investigate and share in other opportunities and/or programs that are the result of the

3    direct and indirect introduction by the Second Party [J. Johnson Consulting, LLC]." (Id. at

4    ¶114).

5        To date, MJG alleges that it has never received an accounting or return of its

6    investment funds. (Id. at ¶117). And, upon information and belief, MJG alleges that the

7    purchased CMO bond was purchased by and is currently being held in the name of Thomas

8    Charles Cooper, as Trustee of the Norema CO Trust, in Oppenheimer Account No.

9    2996-3667.

10    **II.  STANDARD OF REVIEW**

11        To establish personal jurisdiction, the plaintiff must show that: (1) the forum state's

12    long arm statute confers jurisdiction over the non-resident defendant and (2) the exercise of

13    jurisdiction comports with the principles of due process. Omeluk v. Langsten Slip &

14    Batbyggeri A/S, 52 F.3d 267, 269 (9th Cir. 1995). Arizona's long arm statute confers

15    jurisdiction to the maximum extent allowed by the Due Process Clause of the United States

16    Constitution. ARIZ. R. CIV. P. 4.2(A); Doe v. Am. Nat'l Red Cross, 112 F.3d 1048, 1050

17    (9th Cir. 1997). Therefore, the issue before the Court is whether the exercise of jurisdiction

18    over Defendants accords with due process. See Omeluk, 52 F.3d at 269.

19        The Due Process Clause requires that a nonresident defendant have "certain

20    minimum contacts with [the forum] such that the maintenance of the suit does not offend

21    'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326

22    U.S. 310, 316 (1945) (internal citation omitted). There are two types of personal jurisdiction:

23    general and specific. Perkins v. Benquet Consol. Mining, Co., 342 U.S. 437, 445 (1952).

24    General jurisdiction exists where a non-resident defendant engages in substantial, continuous

25    or systematic activities within the forum. Id. When a court has general jurisdiction over a

26    defendant, the defendant may be hailed into that court for any claim, even one that does not

27    arise from the defendant's contacts with that jurisdiction. See Helicopteros Nacionales de

28    Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984). However, when a defendant's contact

1  with the forum does not rise to the level required for general jurisdiction, a court may have

2  specific jurisdiction over a claim when the claim arises from the defendant's activities within

3  that forum.  Shute v. Carnival Cruise Lines, 897 F.2d 377, 381 (9th Cir. 1990), *rev'd on other*

4  *grounds,* 499 U.S. 585, 111 S. Ct. 1522 (1991).

5          Where an evidentiary hearing is not held, dismissal for lack of personal jurisdiction

6  is appropriate only if the plaintiff has not made a *prima facie* showing of personal

7  jurisdiction.  Fields v. Sedgwick Associated Risks, Ltd., 796 F.2d 299, 300 (9th Cir. 1986).

8  "Uncontroverted allegations in [the plaintiff's] complaint must be taken as true, and conflicts

9  between the facts contained in the parties' affidavits must be resolved in [the plaintiff's]

10  favor for purposes of deciding whether a *prima facie* case for personal jurisdiction exists."

11  Am. Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 588 (9th

12  Cir. 1996) (citing WNS, Inc. v. Farrow, 884 F.2d 200, 203 (5th Cir. 1989)).  However, a

13  court may not assume the truth of allegations in a pleading that are contradicted by affidavit.

14  Data Disc., Inc. v. Systems Tech. Assoc., 557 F.2d 1280, 1284 (9th Cir. 1977).  If the

15  plaintiff is able to meet its *prima facie* burden, the movant can nevertheless continue  to

16  challenge personal jurisdiction either at a pretrial evidentiary hearing or at trial itself.

17  Metropolitan Life Ins. Co. v. Neaves, 912 F.2d 1062, 1064, n.1 (9th Cir. 1990).

18  **III.        THE PARTIES' MOTIONS TO DISMISS:**

19          The arguments presented in the three motions to dismiss that have been filed in this

20  case are similar, based on the same set of operative facts, and subject to the same legal

21  standard.   Accordingly, to the greatest extent possible, the Court will consider them

22  simultaneously, instead of conducting three individual evaluations.   However, where

23  individualized analysis is required, it will of course be provided.

24          In response to all three motions to dismiss, Plaintiff concedes that this Court does not

25  have general jurisdiction over the Defendants.  Instead, Plaintiff argues that this Court has

26  specific jurisdiction.   Specific jurisdiction exists where the cause of action arises out of the

27  defendant's activities in the forum state.  Shute, 897 F.2d at 381. The Ninth Circuit utilizes

28  a three-prong test to evaluate the nature and quality of defendant's contacts for purposes of

specific jurisdiction; the test provides: (1) the non-resident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the form, thereby invoking the benefits and protections; (2) the claim must be one which arises out of or results from the defendant's forum related activities; and (3) exercise of the jurisdiction must be reasonable. EDIAS Software Intern., LLC v. BASIS Intern. Ltd., 947 F. Supp. 413, 417 (D. Ariz. 1996). All three factors must exist for personal jurisdiction to apply.   Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 270 (9th Cir. 1995).

### A.   Purposeful Availment

The Ninth Circuit has typically treated purposeful availment somewhat differently in intentional tort cases.   Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1206 (9th Cir. 2006).   In intentional tort cases, courts inquire whether a defendant purposefully directs his activities at the forum state, applying an "effects test", which focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum.   Id. (quotations added); Holland America Line Inc. v. Wartsila North America, Inc., 485 F.3d 450, 460 (9th Cir. 2007) ("It is well established that the [effects] test applies only to intentional torts, not to . . . breach of contract and negligence claims.").   By contrast, with all other types of claims (or at least those that do not involve wrongful targeting), the Ninth Circuit typically inquires whether a defendant "purposefully avails itself of the privilege of conducting activities" or "consummate[s] [a] transaction" in the forum, focusing on activities such as delivering goods or executing a contract."   See Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004). For its *prima facie* showing of personal jurisdiction Plaintiff relies on the allegations set forth in its FAC, its responses to Defendants' various Motions to Dismiss, as well as supporting exhibits and affidavits.  (Docs. 5 & 34).  As Plaintiff asserts intentional torts claims and other

1    types of claims against each of these Defendants, the Court will analyze personal jurisdiction

2    under both the purposeful-direction and purposeful-availment standards.[1]

### 1.    Purposeful Direction (the effects test)

When confronted with a claim in tort the court must "inquire whether a defendant

'purposefully directed his activities' at the forum state, applying an effects test that focuses

on the forum in which the defendants' actions were felt." Id.   To satisfy the effects test, a

defendant must have: "(1) committed an intentional act, (2) expressly aimed at the forum

---

[1] Before addressing the purposeful availment test, the Court must address Plaintiff's Motion to Strike Parts of Defendants Den Bleyker and Johnson's  Reply in Support of their Motion to Dismiss pursuant to Local Rule 7.2(m)(1). LRCIV 7.2(m)(1). (Doc. 38). Plaintiff moves the Court to strike Defendants' citations to Holland v. Hurley, 221 Ariz. 552 (Ct. App. 2009) as the case was de-published three months prior to Defendants filing their Reply in support of their Motion to Dismiss.  (Doc.  36). As a de-published opinion has no precedential effect and cannot be cited as authority in any court, FDIC v. Adams, 187 Ariz. 585, 593 (Ct. App. 1996), the Court grants Plaintiffs Motion to Strike Defendants' citations to Holland from their Reply.

Next, Plaintiff seeks to strike new arguments raised by Defendants in their Reply in Support to their Motion to Dismiss which Plaintiff asserts are not previously raised. (Doc. 38). Specifically, Plaintiff alleges that Defendants argued for the first time in their Reply that the Court does not have jurisdiction over Defendants because the Joint Venture Agreement dated March 11, 2009 had a forum selection clause that required the parties to arbitrate any claims or disputes arising from the JVA in California. (Doc. 38).  Plaintiff also asserts that Defendant argued for the first time in their Reply that Plaintiff lacks standing to assert claims against Defendants. (Id.).  Finally, Plaintiff claims that Defendants referenced and attached to their Reply new evidence: an email from Plaintiff's representative,  Boscarino to Defendant John Johnson.  (Id.).

The Ninth Circuit has consistently held that where new arguments and new evidence is submitted for the first time in a reply brief, the arguments and evidence may be stricken. See Cedano-Viera v. Ashcroft, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003) (declining to consider new issues raised for the first time in a reply brief) (citing Thompson v. Commissioner, 631 F.2d 642, 649 (9th Cir. 1980)); United States v. Wright, 215 F.3d 1020, 1030 n.3 (9th Cir. 2000) (declining to consider an argument raised for the first time in reply brief; Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) (finding that a court may refuse to consider new evidence submitted with a reply brief).  As Defendants  arguments and evidence were raised for the first time in Defendant's reply brief and Plaintiff did not have the opportunity to respond to them, the Court will strike these parts of Defendants' Reply.

1    state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."

2    Id.  Under this test, a defendant need not have had physical contact with the forum state for

3    a court to exercise its jurisdiction.  Brainerd v. Governors of the University of Alberta, 873

4    F.2d 1257, 1260 (9th Cir. 1989).

5         The first prong of the test requires the Court to find that Defendant committed an

6    intentional act.  "'Intent' in the context of the 'intentional act' test refer[s] to an intent to

7    perform an actual physical act in the real world, rather than an intent to accomplish a result

8    or consequence of that act."  Schwarzenegger, 374 F.3d at 806.  An "'act' refers to an

9    external manifestation of the actor's will."  Id. (quoting The Restatement (Second) of Torts

10   § 2 (1964)).  Plaintiff has alleged that all Defendants participated in and played a role in a

11   scheme meant to defraud it of its investment funds.  In its Complaint, Plaintiff has set forth

12   facts which demonstrate that each Defendant has completed an intentional act in service of

13   that scheme.  Rimel sent numerous emails to Boscarino that contained allegedly fraudulent

14   promises of financial success with respect to the proposed CMO investment and that detailed

15   Cloyd's attempts to purchase the CMO and, after it had been bought, to sell it.  Such emails

16   are sufficient to satisfy the intentional acts prong of the effects test. Schwarzenegger, 374

17   F.3d at 806 (holding that placing an add in a local newspaper constituted an intentional act);

18   Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1088 (9th Cir.2000) (finding

19   that the sending of a demand letter constituted an intentional act).  Cloyd, for his part,

20   committed intentional acts by negotiating and facilitating the purchase of the JP Morgan

21   Bond, and by providing Rimel with the information about his actions (information that was

22   conveyed in Rimel's emails).  See Calder v. Jones, 465 U.S. 783, 789 (1984) (finding the

23   researching, writing, editing, and publishing of an allegedly libelous article is an intentional

24   act).  Finally, the Court finds that Defendants Den Bleyker and Johnson (collectively the

25   "Colorado Defendants") also committed intentional acts.  It is alleged that Defendant

26   Johnson drafted the MFA that governed distribution of proceeds from the sale of the CMO.

27   Additionally, it is alleged that Den Bleyker asked McCreight to provide Boscarino and

28

1    Nantais with instructions on how to wire the money to the escrow account.  Finally, it is

2    alleged that Gibraltar Capital, on behalf of the Colorado Defendants, entered into the MFA.

3           Having found that each Defendant satisfied the first prong of the purposeful direction

4    test, the Court turns to the second: whether Defendants actions were expressly aimed at the

5    forum state.  The "express aiming" requirement is met when "the defendant is alleged to have

6    engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a

7    resident of the forum state."  Bancroft & Masters, 223 F.3d at 1087.  Acts that have merely

8    foreseeable effects in the forum state are insufficient.  Id.  All of the Defendants allege either

9    or both that they were unaware that Boscarino was from Arizona and that he represented

10   MJG, an Arizona corporation.  Any such argument is completely unpersuasive with respect

11   to Rimel and Cloyd.  First, Plaintiff has alleged that Rimel and Cloyd were both aware that

12   Boscarino was working on behalf of Plaintiff, an Arizona corporation.  Neither Rimel or

13   Cloyd have produced evidence demonstrating they did not possess this knowledge.  And, to

14   the contrary, circumstantial evidence in the record suggests that they did.   The "Holding

15   Escrow Instructions" provided to Boscarino on March 11, 2009, specifically stated that

16   California Counties title Company was to "hold funds for MJG Enterprises, Inc., An Arizona

17   Corporation ("Holding Party") and release or disburse said funds upon receipt of written and

18   executed instructions from said Holding Party."  The fact that Plaintiff was specifically

19   named belies any claims that either Rimel or Cloyd, both of whom appear to have been

20   directly involved with using the funds provided by ATM to purchase the CMO, were

21   unaware that Boscarino represented MJG and that MJG, not Boscarino, was ATM's primary

22   financial backer.  Additionally, the Court strongly doubts that  the March 11 escrow

23   instructions were the first time Cloyd or Rimel would have been aware of that fact.

24   Accordingly, the Court finds that the alleged misrepresentations and steps taken in service

25   of those misrepresentations by Cloyd and Rimel satisfy the express aiming requirement.

26          Likewise, the Court is also dubious of the Colorado Defendants assertion that they

27   were not aware that  Boscarino was both an Arizona resident and a representative of an

28   Arizona Company.  The Colorado Defendants argue that Boscarino's affidavit statement that

1  he was not "secretive" about his representation of MJG falls short of demonstrating their

2  actual knowledge of that fact.  This Court disagrees.  The clear implication of Boscarino's

3  statement is that Den Bleyker and Johnson were aware of his connection to MJG.  And

4  notably, the Colorado Defendants do not make an outright denial with respect to their actual

5  knowledge.  Other facts also lead this Court to conclude, at least at this juncture, that the

6  Colorado Defendants were aware that Boscarino represented an MJG.  First, they admit

7  learning of  Boscarino's existence, that he was a party to the joint venture, and the primary

8  financial backer for ATM by February 17, 2009, well before the CMO was purchased.  (Doc.

9  22, p. 2).  Given Boscarino's affidavit and the fact that MJG's name was used with respect

10  to the wire transfers, the Court finds it unlikely that the Colorado Defendants did not also

11  discover that Boscarino represented MJG.  Indeed, with respect to Johnson and Johnson

12  Consulting LLC, they entered into a separate JVA agreement with MJG on April 8, 2009,

13  which strongly suggests they were aware of MJG's involvement prior to that date.  Thus,

14  although it is plausible that the Colorado Defendants only learned of MJG's involvement and

15  were not therefore specifically targeting Arizona when they entered into the MFA and First

16  Joint Venture Agreement, their continued participation in the alleged scam satisfies the

17  express aiming requirement.  See, e.g., Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1112

18  (9th Cir. 2002) ("Because Watts and Boenneken knew that Dole's principal place of business

19  was in California, knew that the decisionmakers for Dole were located in California, and

20  communicated directly with those California decisionmakers, we conclude that their actions

21  were "expressly aimed" at the forum state.").

22  　　　　Finally, the Court turns to the third prong of the effects test, which asks if a defendants

23  intentional action aimed at the forum state caused harm that the defendant knew was likely

24  to be suffered in the forum.  "[W]hen a forum in which a plaintiff corporation has its

25  principal place of business is in the same forum toward which defendants expressly aim their

26  acts, the "effects" test permits that forum to exercise personal jurisdiction".  Dole, 303 F.3d

27  at 1114.  In other words, when the Plaintiff's principal place of business is located in the

28  same forum at which the defendant aimed his intentional acts, the Court may find that a

1   defendant knew harm was likely to be suffered in the forum state.  See Id.  The Court has

2   already found that all of the Defendants aimed their conduct at Arizona, which is the

3   principal place of business of Plaintiff MJG.  Accordingly, the effects test is satisfied if

4   Plaintiffs have alleged harm, which they have; the loss of their investment funds.

5       Consequently, the Court finds that all of the Defendants purposefully directed their

6   alleged fraudulent conduct at Arizona, satisfying the first prong of the minimum-contacts

7   test.

8                      **2.       Purposeful Availment**

9       The Court turns next to the more traditional of the minimum contacts test: purposeful

10  availment.   The purposeful availment standard is meant to determine whether "the

11  defendant's conduct and connection with the forum State are such that he should reasonably

12  anticipate being haled into court there."  World-Wide Volkswagen v. Woodson, 444 U.S.

13  286, 297, 100 S. Ct. 559 (1980).  And, it "is based on the presumption that it is reasonable

14  to require a defendant who conducts business and benefits from his activities in a state to be

15  subject to the burden of litigating in that state as well."  Brainerd v. Governors of the

16  University of Alberta, 873 F.2d 1257, 1259 (9th Cir. 1989).  Even if a defendant has not

17  maintained a physical presence in a forum state, that state may still exercise specific

18  jurisdiction over him.  Id.   Instead, the test focuses more on the actions of the defendants:

19       [W]here the defendant 'deliberately' has engaged in significant activities
         within a State, or has created 'continuing obligations' between himself and
20       residents of the forum, he manifestly has availed himself of the privilege of
         conducting business there, and because his activities are shielded by 'the
21       benefits and protections' of the forum's laws it is presumptively not
         unreasonable to require him to submit to the burdens of litigation in that
22       forum as well.

23  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-476 (1985) (internal citations omitted).

24   "Nevertheless, a defendant may not be haled into a jurisdiction as the result of random,

25  fortuitous or attenuated contacts or based upon the unilateral acts of third parties."  Keeton

26  v. Hustler Magazine, Inc., 465 U.S. at 774.

27       None of the Defendants whose motions the Court now considers are residents of

28  Arizona, none are alleged to have visited Arizona.  All business, including the execution of

the various agreements by these Defendants, appears to have been conducted in Colorado and California, and Defendants have not delivered any goods to Arizona.  In short, none of these Defendants can be said to have engaged in significant activities within the state of Arizona. Instead, the question this Court must consider is whether Defendants' actions created a continuing obligation between themselves and MJG, such that they can be said to have availed themselves of conducting business in Arizona.

Answering this inquiry in the affirmative is problematic, as neither MJG nor its representative, Boscarino, were Parties to the MFA.  Instead, ATM was a party to both agreements.  Therefore, any continuing obligations stemming from the MFA were, by the MFA's own terms, between ATM, Gibraltar Financial Group, and Peter Rimel.  Likewise, neither MJG nor Boscarino were Parties to the March 11 JVA, which set forth the various obligations of the Parties in the CMO purchasing plan.  The "Parties" to that agreement were ATM and Gibraltar, and, therefore, any continuing obligations stemming from the JVA did not specifically involve MJG.  In sum, it appears that to the extent Defendants had continuing obligations, they were to ATM, corporate entity of unknown origins that is not a Plaintiff in this case.

Because under the JVA and MFA Defendants did not have any continuing obligations to Plaintiff, the Court cannot conclude that they should reasonably have anticipated being hauled into Court in the forum where Plaintiff is incorporated.  Given this fact, the Court is also unwilling to find that the email and communications by Defendants to Boscarino, a member of ATM and Arizona resident, are sufficient to establish purposeful availment absent such a continuing obligation  See e.g. Brainerd, 873 F.2d at 729 (declining to find purposeful availment test met where alleged contacts consisted of communications between individuals at two universities, and the defendant did not otherwise conduct business in the proposed forum state); see also Scullin Steel Co. v. National Ry. Utilization Corp., 676 F.2d 309, 314 (8th Cir. 1982) ("The use of interstate facilities (telephone, the mail) . . . are secondary or ancillary factors and cannot alone provide the "minimum contacts" required by due process.").

1    Unlike the other Defendants, however, Defendants Johnson and Johnson Consulting

2    LLC ("Johnson Defendants") did enter into a contract with MJG (as opposed to ATM); the

3    April 8 JVA.   The Johnson Defendants argue that this contract is not sufficient to

4    demonstrate purposeful availment because: (1) no business was ever conducted under the

5    April 8 JVA; and (2) the Parties entered into the April 8 JVA after the money provided by

6    MJG had already been used to purchase the CMO bond pursuant to the March 13, 2009

7    Amendment to Escrow Instructions. In support of the latter position, the Johnson Defendants

8    cite Williams v. Lakeview Co.,, for the proposition that "a nexus [must] exist between

9    a defendant's activities in the forum state and a plaintiff's cause of action." 199 Ariz. 1,3,

10   13 P.3d 280,282 (2000)  Defendants argue that no such nexus exists because the actions

11   from which the claims arose had already occurred when Plaintiff and the Johnson Defendants

12   entered into the April 8 JVA.

13   Plaintiff counters that Johnson (1) attempted to fulfill his obligations under the April

14   8 JVA; and (2) that Plaintiffs claims arise from the fraudulent investment scheme as a whole,

15   including Defendants' failure to purchase a CMO bond and sell it pursuant to the various

16   JVAs, including the April 8 JVA.  Based on Plaintiff's own facts, its first assertion appears

17   to be incorrect.  Plaintiff states Johnson attempted to perform under the April 8 JVA by

18   "finding at least one other security trader (Mr. Lambert) and having MJG contract with Mr.

19   Lambert's company SCM." (Doc. 32, p.10).  The Standard Asset Management Agreement

20   entered into between MJG and SCM, however, was signed on April 2, 2009, six days before

21   Plaintiff and the Johnson Defendants signed the April 8 JVA.  (Id., Exh.  3).  As for

22   Plaintiff's second argument, the Court agrees with Defendants that Plaintiff has not

23   sufficiently demonstrated how its non-intentional torts claims arise out of the April 8 2009

24   JVA.  Plaintiff only characterizes the JVA as part of the Defendants' fraudulent scheme,

25   which was considered as part of the Court's purposeful direction analysis.  It has not

26   explained which of its claims cites an injury resulting purely from the April 8 JVA, which

27   is the only agreement that directly involves Plaintiff and is the Johnson Defendants' only

28   Arizona-based activity.  See  Williams, 13 P.3d at 282 ("A plaintiff's claim must result

1  from "alleged injuries that 'arise out of or relate to' [the defendant's] . . . activities" in the

2  forum state. (quoting  Burger King, 471 U.S. at 472)).  The Court finds, therefore, that the

3  April 8 JVA is insufficient for this Court to find that the Johnson Defendants purposefully

4  availed themselves of this forum for the purpose of the non-intentional torts in this lawsuit.

5  Williams, 13 P.3d at 282.

6  ### B.    Arising Out of the Forum Related Activities

7          Having determined that Plaintiff's intentional-tort claims satisfy the first prong of

8  the minimum contacts test, the Court must now determine whether Plaintiff's claims arise

9  out of Defendants' forum-related activities, thereby satisfying the second requirement of

10  the specific jurisdiction test.  A claim arises out of a defendant's contacts with the forum

11  when the claim would not have arisen "but for" the defendant's actions in the forum.

12  Panavision Int'l v. Toeppen, 141 F.3d 1316, 1322 (9th Cir. 1998).   The question

13  therefore is: but for the Defendants' contacts with the Plaintiff, would the Plaintiff's

14  claims have  arisen.  Plaintiff alleges that each of these Defendants played a crucial role

15  in perpetrating the alleged fraud that caused it to lose its CMO investment, without any of

16  whom it would not have become entangled in the alleged scheme.  With respect to the

17  Colorado Defendants, Plaintiff argues that but for the their introduction of the buyers and

18  sellers, solicitation of and participation in a joint venture with ATM, and drafting of the

19  controlling documents and contracts, the CMO investment would not have gone forward.

20  Likewise, it argues that but for Cloyd's participation in and facilitation of the CMO

21  investment as the allegedly knowledgeable and experienced securities trader, and Cloyd's

22  fraudulent representations to  Boscarino in Arizona regarding the safety and profitability

23  of the CMO investment, no investment would have occurred.  Finally, Plaintiff argues

24  that but for Defendant Rimel's communications soliciting, encouraging, and ultimately

25  inducing them, they would not have invested in the CMO.  In light of Plaintiff's

26  allegations that each of these Defendants played a role in part of a larger fraud, the Court

27  is willing to accept that each may have played a but for role in the perpetration of that

28

fraud.  Accordingly, the Court finds that Plaintiff's claims arise out of Defendants'

forum-related activities

**C.     Reasonableness**

Finally, the Court needs to determine if exercising personal jurisdiction over the

Defendants is reasonable.  The Court must "presume that an otherwise valid exercise of

specific jurisdiction is reasonable."  <u>Ballard</u>, 65 F.3d at 1500.  To avoid jurisdiction,

Defendants "must present a compelling case that the presence of some other

considerations would render jurisdiction unreasonable."   <u>Id</u>. (quoting <u>Burger King Corp.</u>

<u>v. Rudzewicz</u>, 471 U.S. 462, 477 (1985)).  In determining reasonableness, the Court must

consider:

> (1) the extent of the defendants' purposeful injection into the forum state's
> affairs; (2) the burden on the defendant of defending in the forum; (3) the
> extent of conflict with the sovereignty of the defendant's state; (4) the forum
> state's interest in adjudicating the dispute; (5) the most efficient judicial
> resolution of the controversy; (6) the importance of the forum to the
> plaintiff's interest in convenient and effective relief; and (7) the existence of
> an alternative forum

<u>Dole</u>, 303 F.3d at 1114.  Finally, the court must balance and weigh all seven factors; none

is dispositive.  <u>Ziegler v. Indian River County</u>, 64 F.3d 470, 475 (9th Cir 1995).

**1.     Purposeful Injection**

The first factor the Court must consider is purposeful injection.  The Court has

already concluded that Defendants purposefully directed their  actions at Arizona.  This is

sufficient to meet the purposeful injection standard. <u>Sinatra v. National Enquirer, Inc.</u>,

854 F.2d 1191, 1199 (9th Cir. 1988) ("The factor of purposeful interjection is analogous

to the purposeful direction analysis discussed above.").

**2.     The Burden of Defending in the Forum**

"[U]nless the inconvenience [to the defendants of litigating in the forum state] is

so great as to constitute a deprivation of due process, it will not overcome clear

justifications for the exercise of jurisdiction." <u>Panavision Intern., L.P. v. Toeppen</u>, 141

F.3d 1316, 1323 (9th Cir. 1998) (internal quotation omitted).  Defendants in this case

appear to be residents of Colorado and California, which are states in close proximity to

1   Arizona.  In addition, the Court notes that "modern advances in comminations and

2   transportation have significantly reduced the burden of litigating" in another forum.

3   Sinatra v. Nat'l Enquirer, Inc., 854 F.2d 1191, 1199 (9th Cir.1988).   This factor weighs in

4   favor of the reasonableness of personal jurisdiction.

5                   **3.       Conflict with the Sovereignty of Colorado and California**

6           Third, the Court finds that its exercise of jurisdiction in Arizona creates  no

7   conflict of sovereignty with Defendant's home state of California.  The conflict between

8   the laws of a defendant's home state and the proposed forum is not a very significant

9   factor in cases involving only United States citizens since conflicting policies between

10  states are settled through choice of law analysis, not through loss of jurisdiction.  Brand v.

11  Menlove Dodge, 796 F.2d 1070, 1076 n.5. (9th Cir. 1985).  Here, Defendants are citizens

12  of California and Colorado, while Plaintiff is an Arizona corporation.  Therefore, in

13  determining whether it is reasonable to exercise jurisdiction, this factor weighs in favor of

14  reasonableness.

15                         **4.  Forum State's Interest**

16          Fourth, the State of Arizona's interest in adjudicating the dispute weighs in favor

17  of finding jurisdiction reasonable.  A state is deemed to have a strong interest in

18  protecting its citizens against the tortious acts of others.  Cubbage v. Merchent, 744 F.2d

19  665, 671 (9th Cir. 1984).  In the instant action, Plaintiff, an Arizona corporation, alleges

20  that Defendants individual and collectively, along with other defendants in the instant

21  action, actively solicited and/or facilitated, aided, and abetted in the solicitation of

22  Plaintiff in an allegedly fraudulent CMO investment scheme which resulted in economic

23  injury to Plaintiff.  Arizona has a strong interest in providing Plaintiff, an Arizona

24  corporation, with an effective means of redress for the alleged tortious conduct of

25  Defendants.  Accordingly, this factor weights in favor of a finding of reasonableness.

26                         **5.       Efficiency of Adjudication**

27          "The site where the events in question took place or where most of the evidence is

28  located usually will be the most efficient forum."  Brand, 796 F.2d at 1070.  However,

1   this factor is no longer weighed heavily given the modern advances in transportation and

2   communication.  Caruth v. Int'l Psychoanalytical Ass'n, 59 F.3d 126, 129 (9th Cir. 1995).

3   The Court notes that Plaintiff's principal place of business is in Arizona and Plaintiff's

4   representatives are Arizona residents.  In addition, MJG's investment funds came from its

5   bank in Arizona and evidence and witnesses can be found in Arizona.  On the other hand,

6   that Defendants are California and Colorado residents.  The Court further notes that the

7   transactions and events surrounding the actions that pertain to Defendants were largely

8   conducted via email and telephone, thus much of the evidence surrounding the case

9   would be available in both California, Colorado, and Arizona.  Finally, the Court notes

10  that this Court is already familiar with the claims, facts, and parties involved.  On

11  balance, the Court finds that efficiency of adjudication can most readily be achieved by

12  leaving the case where it is; in Arizona.

13              **6.      Convenience and Effectiveness of Relief for Plaintiff**

14          Sixth, the Court is required to look at the convenience and effectiveness of relief of

15  having trial in Plaintiff's desired forum.  Plaintiff is an Arizona corporation.  The

16  maintenance of a suit outside of Arizona would clearly be less convenient for Plaintiff.

17  Defendants have not shown that Plaintiff's claim can be more effectively remedied

18  elsewhere. Consequently, the Court finds that this factor weighs in favor of the Plaintiff;

19  Arizona is the most convenient and effective forum of relief.

20              **7.      Existence of an Alternative Forum**

21          Finally, the Court considers whether an alternative forum exists.  This element

22  only comes into play, however, "when the forum state is shown to be unreasonable."

23  Corporate Investment Business Brokers v. Melcher, 824 F.2d 786, 791 (9th Cir. 1987).

24  The Court finds that such a showing has not been made.  In balancing the factors above,

25  the Court finds that its exercise of jurisdiction over Defendants is both reasonable and

26  proper.  Therefore, the Court finds that Plaintiff has made the necessary *prima facie*

27  showing of jurisdictional fact with respect to its claims over Defendant.

28      **D.      Conclusion**

1    After balancing each and every one of the reasonableness test factors, this Court

2    concludes that its exercise of jurisdiction over the Defendants is both reasonable and

3    proper.  The burden of rebutting the presumption of reasonableness lay with the

4    Defendants; it was not met. Id.  Therefore, this Court finds that Plaintiff has made the

5    necessary *prima facie* showing of jurisdictional fact with respect to its  intentional tort

6    claim.  The Court cannot exercise jurisdiction over Plaintiff's other claims, as the facts

7    plead do not permit a finding that the first element of the minimum contacts

8    test—purposeful availment—has been satisfied.

9    However, "[w]hen a defendant must appear in a forum to defend against one claim,

10   it is often reasonable to compel that defendant to answer other claims in the same suit

11   arising out of a common nucleus of operative facts."  Action Embroidery Corp. v.

12   Atlantic Embroidery, Inc., 368 F.3d 1174, 1181 (9th Cir. 2004).   Under the doctrine of

13   pendent personal jurisdiction the court may exercise its jurisdiction "over a defendant

14   with respect to a claim for which there is no independent basis of personal jurisdiction so

15   long as it arises out of a common nucleus of operative facts with a claim in the same suit

16   over which the court does have personal jurisdiction." Id. at 1180.  Such a decision  is

17   completely within the Court's discretion and should be made to promote "judicial

18   economy, avoidance of piecemeal litigation, and overall convenience."  Id. at 1181.

19   Plaintiff's non-intentional tort claims against Defendants, over which this Court does not

20   have jurisdiction, clearly arise from the same set of operative facts.  Consequently, the

21   Court finds that exercising its jurisdiction over all of Plaintiff's claims will promote the

22   interests of justice and the efficient use of the parties' and the Court's resources.

23   **Accordingly,**

24   **IT IS HEREBY ORDERED** denying Defendants Nate  N.  Den Bleyker,

25   Gibraltar Financial Group, Inc., John P.  Johnson, and J.  Johnson Consulting LLC's

26   Motion to Dismiss Pursuant to Rule 12(b)(2).  (Doc.  22).

27   **IT IS FURTHER ORDERED** denying Defendants Peter Rimel, Kimberly Rimel

28   and Rimel & Nichols, LLP's Motion to Dismiss Pursuant to Rule 12(b)(2).  (Doc.  20).

1        **IT IS FURTHER ORDERED** denying Defendant Glen Cloyd's  Motion to

2   Dismiss Pursuant to Rule 12(b)(2).  (Doc.  30).

3        **IT IS FURTHER ORDERED** granting Plaintiff MJG's Motion to Strike. (Doc.

4   38).

5        DATED this 23rd day of September, 2010.

6

7

8

9   _____

                    Mary H. Murguia

10                  United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28